AFFYMETRIX, INC., Plaintiff,

v.

SYNTENI, INC. and Incyte
Pharmaceuticals, Inc.,
Defendants.

Nos. CIV. A. 98–006–GMS, 98–520–GMS.

United States District Court,
D. Delaware.

Nov. 18, 1998.

Stewart B. Young, Matt Denn, Martin S. Lessner, John W. Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE, William L. Anthony, Shelley J. Sandusky, Craig R. Kaufman, Elizabeth A. Howard, Orrick, Herrington & Suttcliffe, Menlo Park, CA, for Plaintiff.

William J. Marsden, Jr., Joan Taft Kluger, Potter, Anderson & Coroon, Wilmington, DE, Robert P. Taylor, Teresa M. Corbin, N. Thane Bauz, Jenifer A. Tipsord, Sharmini N. Green, Howrey & Simon, Menlo Park, CA, for Defendants.

## OPINION

SLEET, District Judge.

### I. INTRODUCTION.

Plaintiff, Affymetrix, Inc. ("Affymetrix"), has filed two actions for patent infringement against Defendants Synteni, Inc. ("Synteni") and Incyte Pharmaceuticals, Inc. ("Incyte") with this Court.

On January 6, 1998, Affymetrix filed the first of these two lawsuits, Civil Action No. 98–6, alleging the willful infringement of U.S. Patent No. 5,445,934 ("the '934 patent") by Synteni and Incyte. Eight months later, on September 1, 1998, Affymetrix filed a second lawsuit, Civil Action No. 98–520, for the alleged infringement of U.S. Patent Nos. 5,744,305 ("the '305 patent") and 5,800,992 ("the '992 patent"). Both complaints seek injunctive relief as well as money damages.

This Court has jurisdiction pursuant to 35 U.S.C. §§ 101, *et seq.* and 28 U.S.C. §§ 1331 and 1338.

In both instances, before answering, Synteni and Incyte moved under 28 U.S.C. § 1404(a) to transfer these actions from the District of Delaware to the Northern District of California. For the reasons discussed below, the Court grants both of these motions.

### II. THE PARTIES AND THEIR INVENTIONS.

Affymetrix, a wholly-owned subsidiary of Affymax N.V. ("Affymax"), first began operating in the early 1990s to pursue research in the field of high density arrays. These arrays contain thousands of sequences of genetic material and are used by medical and scientific researchers in their search to discover the causes of (and cures for) diseases such as cancer and AIDS.

In developing this technology, Affymetrix has obtained a number of patents. Those in suit are the '934, '305, and '992 patents. These patents describe the process that Affymetrix uses in manufacturing its high density arrays which are sold under the trademark "GeneChip."

At the same time that Affymetrix was conducting its research into high density arrays, Incyte broke ground on its own development—the creation of a portfolio of "genomic" databases which catalogued millions (if not billions) of series of genetic information. These databases were (and still are) used by the research and development divisions of major pharmaceutical companies to not only perfect existing drugs but also create new ones.

In 1996, Affymetrix and Incyte joined forces to develop a set of customized high density arrays, sold under the trademark "LifeChips." However, in January of 1998, Incyte acquired Synteni and began to market its own competing (the accused) product—

the Gene Expression Micro–Array (or "GEM").

At the time, Synteni was a privately-held company. Originally incorporated under California law in 1994, Synteni reincorporated under Delaware law in 1997 (one year before it was acquired by Incyte). Presently, Synteni holds the exclusive world-wide rights from Stanford University ("Stanford") to commercialize the GEM array technology. The GEM array is a "high density array of DNA molecules bonded onto a small glass surface." Synteni markets the GEM array to companies in the agricultural and pharmaceutical industries.

Shortly after Incyte acquired Synteni, Affymetrix filed these two lawsuits.

## III.  THE RELEVANT FACTS.

At the time that both of these actions were filed, Affymetrix was a California corporation with its principal place of business in Santa Clara, California.[1] Synteni and Incyte, on the other hand, were (and, in fact, still are) Delaware corporations [2] with their principal places of business in the respective cities of Fremont and Palo Alto, California.

### A.  Their Connection (Or Lack Thereof) To The District of Delaware.

None of the parties maintain any facilities or employ any personnel in Delaware. They manufacture none of their products (accused or otherwise) and conduct none of their research or development here. Moreover, they maintain no warehouses or other storage facilities in Delaware. Additionally, they store no relevant files, records, or other documents in the District. Finally, none of them keeps any mail drops, bank accounts, or telephone numbers in Delaware.

### B.  Their Connection To The Northern District Of California.

The headquarters and laboratories of all of three of these companies are located within roughly twenty miles of each other in the area of northern California known as Silicon Valley. Synteni and Incyte maintain all of their research laboratories, sequencing facilities, and administrative buildings in either Fremont or Palo Alto. All of their employees reside in California, and all of their records are kept there. Affymetrix maintains all of its corporate offices and research facilities in Santa Clara. All of its employees and records are located in California as well. Thus, the overwhelming majority of the witnesses whom the parties intend to call at trial as well as all of the relevant documents (including numerous laboratory notebooks) are located in the Northern District of California.

---

1.  In June of 1998, the shareholders of Affymetrix voted to reincorporate in Delaware. The company completed this reincorporation in late September of 1998. According to Affymetrix, the decision to reincorporate was made "for reasons unrelated to this lawsuit." Taking Affymetrix at its word, the Court nonetheless undertakes its analysis as if Affymetrix was a foreign corporation.

In the District of Delaware, the district courts have traditionally followed the lead that the United States Supreme Court set in *Hoffman v. Blaski,* basing their transfer analysis on only those facts which existed at the time that the complaint was filed. *See, e.g., Waste Distillation Tech., Inc. v. Pan American Resources, Inc.,* 775 F.Supp. 759, 761 (D.Del.1991) (citing *Hoffman v. Blaski,* 363 U.S. 335, 342–43, 80 S.Ct. 1084, 1088–89, 4 L.Ed.2d 1254 (1960)).

In *Hoffman,* the Supreme Court rejected the "thesis" that the "phrase 'where it might have been brought' [in Section 1404(a)] should ... relate not only to the time of the bringing of the action but also to the time of transfer." 363 U.S. at 342, 80 S.Ct. at 1089. In the opinion of the *Hoffman* court, such an approach "would not only do violence to the plain words of [Section] 1404(a) but would also inject gross discrimination" into the analysis, 363 U.S. at 344, 80 S.Ct. at 1090, because it would effectively allow defendants to "move their residences, or, if corporations, ... begin the transaction of new business in, some other district" in order to litigate in a more advantageous forum. 363 U.S. at 342, 80 S.Ct. at 1089. Like the dissent in *Paramount Pictures, Inc. v. Rodney,* 186 F.2d 111, 119 (3d Cir.1950), the *Hoffman* court failed to "see how the conduct of a defendant after [the] suit has been instituted c[ould] add to the forums where 'it might have been brought.'" *Hoffman,* 363 U.S. at 343, 80 S.Ct. at 1089 (quoting *Paramount,* 186 F.2d at 119)).

Thus, for the purposes of this opinion, the Court considers Affymetrix as a foreign corporation.

2.  Incyte originally incorporated in Delaware in 1991. As mentioned earlier, Synteni reincorporated in Delaware in 1997. Initially, it was a California corporation.

### 1. The inventors.

Five of the six inventors named in the patents in suit reside in the Northern District. While the sixth permanently resides in North Carolina, for the next eight months (or so) he will be living in southern California.

Specifically, three of the four inventors listed on the '934 and '305 patents (Stephen Fodor, Leighton Read, and Lubert Stryer) reside in the Northern District of California. The fourth (Michael Pirrung) is a professor at Duke University and resides in North Carolina. He, however, is currently on sabbatical, teaching at the University of California in San Diego. He thus lives approximately 500 miles South of the Northern District. Of the remaining two inventors[3] listed on '992 patent (Denis Solas, and William Dower), both reside in the Northern District.

Dr. Fodor is the Chief Executive Officer of Affymetrix and, therefore, a party witness. In their affidavits, Dr. Read and Professor Stryer have pledged that they will make themselves available for trial. They only ask sufficient notice in order to make proper arrangements with respect to their teaching and research obligations. Finally, in both of their declarations, Mr. Solas and Mr. Dower aver their willingness to voluntarily attend trial if needed.

### 2. Other witnesses.

In addition to these six inventors, Synteni and Incyte expect to call Patrick Brown, Dari Shalon, Ron Davis, Mark Schena, and Radjoe Drmanac at trial.

Professor Brown is a member of the Stanford faculty who conducts research into micro-array technology.

Dr. Shalon developed the technology behind the GEM array while conducting postdoctoral research in Professor Brown's lab. Later, in 1994, he founded Synteni. He now serves as its president and CEO and is, therefore, a party witness.

At the same time that Dr. Shalon was conducting his research in Professor Brown's laboratory, Professor Davis (another member of the Stanford faculty) was actively collaborating with Affymetrix. Specifically, he was performing subcontract work for the company for the purposes of advancing its high density array technology. During this time, Professor Schena (a post-doctoral fellow at Stanford) worked under Professor Brown.

Two of these individuals (Professors Brown and Schena) have expressed an unwillingness to voluntarily appear for trial. In his declaration, Professor Brown avers that attending trial would prove extremely costly while disrupting both his research activities and teaching duties. And, in an affidavit filed with the Court, counsel for Synteni and Incyte affirms that an attorney representing Professor Schena has expressed similar sentiments on behalf of his client.

An attorney representing Dr. Drmanac, the president of Hyseq, Inc. ("Hyseq") another Silicon Valley company which manufactures competing micro-arrays, has also communicated with defense counsel, stating that Dr. Drmanac is "unwilling to voluntarily appear [for] trial . . . in a matter unrelated to his business."

In addition to these five designated witnesses, Synteni and Incyte claim that there are numerous other individuals residing in the Northern District who are likely to have personal knowledge about either the specific facts of this dispute or the prior art. In support of their contention, they note that, besides Affymetrix, Synteni, Incyte, and Hyseq, three other microarray companies are located in Silicon Valley. According to Synteni and Incyte, the current and former employees of these seven entities might possess some knowledge or information relevant to this lawsuit. At this time, however, neither Synteni nor Incyte can identify any of these potential witnesses by name.

### 3. An apparently related proceeding.

On August 18, 1998, Affymetrix brought a patent infringement action against Hyseq in the Northern District of California. That lawsuit (Case No. C 98–03192) alleges infringement of the '305 patent as well as U.S. Patent No. 5,795,716 ("the '716 patent"). On

---

**3.** Dr. Fodor is also listed as an inventor on the '992 patent.

September 1, 1998, Affymetrix amended its Complaint against Hyseq to include a claim for infringing upon the '992 patent. The Honorable Fern M. Smith, United States District Court Judge, presides over the litigation in the Northern District.

### C. Their Connection to Delaware (Revisited).

Affymetrix, Synteni, and Incyte are all multi-million dollar corporations that maintain ties to multi-national companies within the pharmaceutical industry. All three of the parties conduct business on a global scale.

For example, Affymetrix has forged business relationships with several Delaware corporations—twenty-two, to be exact (two of which are actually located in Delaware).

In 1996, Incyte entered into an agreement with Zeneca Pharmaceuticals, Inc. ("Zeneca") which affords Zeneca access to several Incyte databases. Zeneca maintains a research facility in Wilmington, Delaware. As a division of Zeneca, this facility enjoys access to select Incyte databases. On a monthly basis, Incyte updates this database via CD–ROM. On occasion, Zeneca scientists contact Incyte with questions about the type or location of information contained on these databases.

In addition, both Synteni and Incyte are presently pursuing deals with two Delaware pharmaceutical companies—specifically, DuPont and DuPont Merck. In fact, Synteni has proposed a pilot program for its GEM array with both DuPont Merck and Zeneca.

Finally, as mentioned earlier, Synteni and Incyte are Delaware corporations. In fact, in 1997, Synteni left California to reincorporate in Delaware. One year later, in 1998, it was acquired by Incyte.

### IV. THE LAW.

Under 28 U.S.C. § 1404(a), "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the Court *may* transfer these two actions to "any other district where [they] might have been brought." 28 U.S.C. § 1404(a) (1994).

### A. Where These Two Actions "Might Have Been Brought."

As a threshold matter, the Court must first ask whether Affymetrix could have brought these two actions in the Northern District of California. *See Tuff Torq Corp. v. Hydro–Gear Ltd. Partnership*, 882 F.Supp. 359, 361 (D.Del.1994). If the Court answers this question in the negative, then its inquiry ends. *See Camasso v. Dorado Beach Hotel Corp.*, 689 F.Supp. 384, 386 (D.Del.1988) (refusing to transfer the case when the target forum could not exercise personal jurisdiction over one of the defendants); *see also Tuff Torq*, 882 F.Supp. at 361–62 (denying transfer where the target forum could not exercise personal jurisdiction over two of the defendants).

Affymetrix, however, does not contest that these two actions could have been brought in the Northern District of California. All of the parties maintain their corporate headquarters in cities located there. *See* 28 U.S.C. § 1391(b)(1) (1994). Furthermore, the overwhelming majority of the events giving rise to these two lawsuits occurred there. *See id.* at § 1391(b)(2). Finally, as patent infringement actions, these two lawsuits could have been initially filed there. *See id.* at § 1400(b). Since Affymetrix could have brought these two actions in the Northern District of California, the Court turns to an examination of the remaining criteria enumerated in Section 1404(a) in order to determine if transfer is warranted.

### B. The Remaining Three Statutory Criteria As Well As The Eleven Factors Articulated In The *Jumara* Opinion.

As the text of Section 1404(a) indicates, in making this determination, the Court must consider whether transferring these two actions to the Northern District of California would convenience (1) the parties and (2) the witnesses while (3) serving the interests of justice.

■ In the Third Circuit, this inquiry is a broad one. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995). The Court should examine "all relevant factors to determine whether, on balance, the litigation

would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *See id.* (quoting 15 *Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters* § 3847 (2d ed.1986)). These "factors" include a wide variety of private and public interests [4] which the Court should consider in order to "determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Id.* at 879, 883 (citing *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 30–31, 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22 (1988)).

■ The private interests include but are not limited to: (1) the plaintiff's initial choice of forum; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial position; (5) the convenience of the witness—but only to the extent that they may be unavailable for trial in one of the fora; and (6) the location of records and other documents—but, again, only to the extent that these files could not be produced in the alternate forum. *See id.* at 879.

■ Among the public interests are: (1) the ability of the Court to enforce the judgment; (2) practical considerations making trial easy, expeditious, or inexpensive, (3) the administrative difficulties posed by the relative congestion of the two dockets in the respective fora; (4) any local interest in de-

ciding local controversies at home; as well as (5) the public policies of the fora. *See id.* at 879–80.

While these lists are "merely illustrative and by no means exhaustive," *see Bering Diagnostics GmbH v. Biosite Diagnostics, Inc.,* No. Civ. A. 97–501, 1998 WL 24354, at *3 (D.Del. Jan.6, 1998), they nevertheless provide a solid foundation to support this Court's opinion.

1. The private interests.

The six private interests announced in the *Jumara* opinion significantly duplicate the first two factors articulated under the federal venue statute. *Compare Jumara,* 55 F.3d at 879–80 *with* 28 U.S.C. § 1404(a). For reasons the Court will soon discuss, it declines to give any weight to the first three *Jumara* interests—specifically, the plaintiff's choice of forum, the defendants' preferred forum, and whether the claim arose elsewhere—in its determination of where the "balance of convenience" lies. As the Court will explain, affording weight to these factors for their own sake runs the risk of double-counting them thereby compromising the transfer analysis.

a. The plaintiff's choice of forum.

In *Shutte v. Armco Steel Corp.,* the Third Circuit stated that a "plaintiff's choice of a proper forum is a paramount consideration" which "should not be lightly disturbed." 431 F.2d at 25. As a result, on their motions to transfer, Synteni and Incyte bear a heavy

---

4. In 1947, the Supreme Court articulated a virtually identical list of factors. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The *Gulf Oil* court addressed the question of whether a district court had properly exercised its discretion by dismissing an action under the doctrine of *forum non conveniens.* 330 U.S. at 501–04, 67 S.Ct. at 840–41. Recognizing that a court may, under certain (limited) circumstances, "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute," 330 U.S. at 507, 67 S.Ct. at 842, the *Gulf Oil* court listed several considerations (i.e., private and public interests) that a court should keep in mind when deciding whether to dismiss on these grounds. 330 U.S. at 508, 67 S.Ct. at 843.

With the advent of the federal venue statute in 1948, the district and circuit courts understand-

ably looked to *Gulf Oil* for guidance in determining whether transfer was appropriate under Section 1404(a). *See All States Freight, Inc. v. Modarelli,* 196 F.2d 1010, 1011 (3d Cir.1952); *Paragon–Revolute Corp. v. C.F. Pease Co.,* 120 F.Supp. at 488, 489 (D.Del.1954); *General Felt Prods. Co. v. Allen Indus., Inc.,* 120 F.Supp. 491, 493 (D.Del.1954). In so doing, they incorporated several of its considerations into their discussion and analysis. *See All States Freight,* 196 F.2d at 1011; *see also Chicago R.I. & Pacif. R.R. Co. v. Igoe,* 212 F.2d 378, 382 (7th Cir.1954); *Sun Oil Co. v. Lederle,* 199 F.2d 423, 424 (6th Cir.1952); *Ford Motor Co. v. Ryan,* 182 F.2d 329, 330 (2d Cir.1950); *Headrick v. Atchison T & S.F. Ry. Co.,* 182 F.2d 305, 310 (10th Cir. 1950).

burden. *Cf.* 15 *Charles Alan Wright, Arthur R. Miller & Edward H. Cooper* § 3848, at 383 ("The[ ] various forms of words on the weight to be given [to] plaintiff's choice of forum are an attempt to verbalize the burden that defendants must carry in order to persuade the court that transfer should be granted."). In other words, the Court should grant their motions only when the "balance of convenience ... is strongly in favor of [the] defendant." [5] *See Shutte,* 431 F.2d at 25.

However, as Synteni and Incyte point out, Affymetrix has not elected to sue on its "home turf." [6] Accordingly, they contend, its choice of forum should receive little deference. *See, e.g., Willemijn Houdstermaatschaapij BV v. Apollo Computer, Inc.,* 707 F.Supp. 1429, 1436 (D.Del.1989); *Derry Fin. N.V. v. Christiana Cos., Inc.,* 555 F.Supp. 1043, 1045 (D.Del.1983). Consequently, they argue, they should bear a lighter burden on their motions to transfer. *See Kollmorgen Corp. v. Gettys Corp.,* 760 F.Supp. 65, 67 (D.Del.1991); *Kirschner Bros. Oil, Inc. v. Pannill,* 697 F.Supp. 804, 806 (D.Del.1988); *Lee v. Ohio Casualty Ins. Co.,* 445 F.Supp. 189, 192 (D.Del.1978).

In response, Affymetrix contends that since it decided to file in Delaware for a legitimate and rational reason, namely, the "lighter" and therefore "faster" docket, its choice of forum should still receive substantial deference. *See C.R. Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 561 (D.Del. 1998); *Schering Corp. v. Amgen, Inc.,* 969 F.Supp. 258, 262 (D.Del.1997); *Joint Stock Soc'y v. Heublein,* 936 F.Supp. 177, 185 (D.Del.1996); *Waste Distillation,* 775 F.Supp. at 764.

While understandable, their interpretations of the "home turf" rule and its "rational and legitimate concerns" exception are incorrect.

i. The home turf "rule."

In *Burroughs Wellcome Co. v. Giant Food, Inc.,* Judge Stapleton articulated what has become known as the "home turf" rule. 392 F.Supp. 761, 763 (D.Del.1975). While the Judge interpreted *Shutte* as establishing an "across-the-board rule favoring [a] plaintiff's choice of forum," he nevertheless noted that this presumption in favor of the plaintiff's choice of forum was far from irrebuttable. *Id.* For example, "[w]here the forum selected by [a] plaintiff is connected with

---

**5.** In *Gulf Oil,* the Supreme Court articulated a virtually identical standard. *Compare Gulf Oil,* 330 U.S. at 508, 67 S.Ct. at 843 ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.") *with Shutte,* 431 F.2d at 25 ("[U]nless the balance of convenience is strongly in favor of defendant, the plaintiff's choice of forum should prevail.") (quoting *Owatonna Mfg. Co. v. Melroe Co.,* 301 F.Supp. 1296, 1307 (D.Minn.1969)). Thus, at first glance, it might appear that the *Shutte* court replaced the lighter burden that a defendant should bear when moving to *transfer* with the heavy burden that a defendant bears in order to show that *dismissal* is warranted under the doctrine of *forum non conveniens.*

However, as the Third Circuit Court of Appeals has noted, the words of Section 1404(a) "should be considered for what they say, not with preconceived limitations derived from the *forum non conveniens* doctrine." *See All States Freight,* 196 F.2d at 1011–12; *see also Paragon–Revolute,* 120 F.Supp. at 489 ([D]isturbing plaintiff's choice of forum is no longer a rarity because of [Section] 1404(a)—defendant's mandatory margin for victory, then, need not be an overwhelming one) (relying on *All States Freight* ); *General Felt,* 120 F.Supp. at 493 (recognizing that, under Section

1404(a), "no longer should disturbing plaintiff's choice of forum be regarded sacrilegious ... if the three statutory factors dictate transfer") (relying on same).

Thus, although the Court should grant the pending motions only if the "balance of convenience tips strongly in favor of [transfer]," *see Shutte,* 431 F.2d at 25, the showing that Synteni and Incyte must make in order to prevail on their motions is necessarily something less than that required under the doctrine of *forum non conveniens. Cf. All States Freight,* 196 F.2d at 1011–12; *Paragon–Revolute,* 120 F.Supp. at 489; *General Felt,* 120 F.Supp. at 493.

**6.** In the District of Delaware, "home turf" is defined as the forum closest to the plaintiff's residence or principal place of business which can exercise personal jurisdiction over the defendant at the time that the lawsuit is filed. *See Mayer v. Development Corp. of America,* 396 F.Supp. 917, 929 (D.Del.1975). As a corporation which (at the time of filing) was incorporated under the Laws of California and headquartered in the State of California, Plaintiff's "home turf" was California since it was the jurisdiction closest to Affymetrix in which it could effect proper service upon Synteni and Incyte.

neither the plaintiff nor … the subject matter of the lawsuit, meeting the burden of showing sufficient inconvenience to tip the 'balance' of convenience 'strongly in favor of [the] defendant' will ordinarily be less difficult." *Id.* (quoting *Shutte* ).

While the Court does not mean to parse words, it believes that Judge Stapleton chose his terms carefully for a reason. Under *Burroughs,* there is a difference, albeit a small one, between the "plaintiff's choice of forum" and the "forum selected by the plaintiff." Understanding this difference is the key to unlocking the meaning of the "home turf" rule.

As articulated by Judge Stapleton, the "home turf" rule says nothing at all about the amount of consideration, paramount or otherwise, afforded to the plaintiff's *choice* of forum. On that issue, the Judge deferred to the Third Circuit. *See Burroughs,* 392 F.Supp. at 762–63 (quoting *Shutte,* 431 F.2d at 25). Since this choice was a "paramount consideration" which "should not be lightly disturbed," *see Shutte,* 431 F.2d at 25, the defendants carried a heavy burden on their motion to transfer. *Cf.* 15 *Charles Alan Wright, Arthur R. Miller & Edward H. Cooper* § 3848, at 383.

However, in the subsequent "balance of convenience" analysis which Judge Stapleton conducted in order to determine whether the defendant has met its heavy burden, this "choice of forum" played no role. Judge Stapleton did not place on the scale the *fact* that the plaintiff chose the District of Delaware as its forum since he already took this fact into account when establishing the heavy burden that the defendants bore in order to prevail on their motion to transfer. Instead, the Judge weighed, to use the words of the *Gulf Oil* court, the "advantages and obstacles to a fair trail," 330 U.S. at 508, 67 S.Ct. at 843, provided by the "forum selected by the plaintiff" and compared them to those presented by the forum preferred by the defendants in order to determine whether the "balance of convenience" tipped strongly in favor of the latter venue. *See Burroughs,* 392 F.Supp. at 762–63.

Thus, Judge Stapleton's "home turf rule" is merely a short-hand way of saying that,

under the balancing test inherent in any transfer analysis, the weaker the connection between the forum and *either* the plaintiff *or* the lawsuit, the greater the ability of a defendant to show sufficient inconvenience to warrant transfer. *See Burroughs,* 392 F.Supp. at 763; *see also General Instrument Corp. v. Mostek Corp.,* 417 F.Supp. 821, 822–23 (D.Del.1976) (explaining *Burroughs* ).

In the cases at bar, Synteni and Incyte correctly point out that Affymetrix has ventured off of its "home turf" in order to file suit in the District of Delaware. They, however, incorrectly believe that, as a result, the Court should pay "less" or "little" deference to their opponent's choice of forum and, therefore, that they should bear a lighter burden on their motions to transfer. The Court disagrees. The approach advocated by Synteni and Incyte risks double-counting the plaintiff's choice of forum by essentially considering twice—once, when establishing the burden that a defendant must overcome in order to prevail on its motion to transfer and then again, when weighing the relative "advantages and obstacles to a fair trial" presented by the two fora—thereby throwing off the "balance of convenience."

As applied to the cases at bar, *Burroughs* and *General Instrument* simply suggest that Synteni and Incyte should find it easier to show that the "balance of convenience" weighs strongly in favor of transfer since compared to their preferred venue there are arguably fewer connections between this forum and the subject matter of these two lawsuits. *See Burroughs,* 392 F.Supp. at 762–63; *see also General Instrument,* 417 F.Supp. at 822–23. That, however, is all that *Burroughs* and *General Instrument* suggest. Neither one of these two decisions either states or implies the Court should, or even could, pay "less deference" or "little deference" to their opponent's choice of forum simply because Affymetrix left its "home turf" to sue in the District of Delaware.

Regardless of whether the plaintiff is leaving or remaining on his "home turf" to file suit in Delaware, the degree of consideration paid to this choice stays the same—it is "paramount." *See Shutte,* 431 F.2d at 25;

*see also General Instrument,* 417 F.Supp. at 822–23. Consequently, the Court should not disturb this choice lightly. *See Shutte,* 431 F.2d at 25. As a result, Synteni and Incyte bear a heavy burden in their motions for they must show that the "balance of convenience" tips *strongly* in favor of transfer. *Id.*

ii. The rational and legitimate concerns "exception" to the home turf "rule."

■ Fearing that the Court will pay little deference to its choice of forum because it filed suit off of its "home turf" (i.e., California), Affymetrix argues that it had a "legitimate, rational reason" for so doing. *See Joint Stock,* 936 F.Supp. at 186 (referring to *Waste Distillation,* 775 F.Supp. at 764). For this reason, Affymetrix contends, its choice of forum should still receive "substantial" or "particular" deference. *See Schering,* 969 F.Supp. at 262 (citing same). Affymetrix, however, misunderstands the role which its rational and legitimate concern plays in the transfer analysis.

The Court assumes that in selecting a forum plaintiffs make a choice that "generally reflect[s] their rational and legitimate concerns, including convenience to themselves and their witnesses." *See Clopay Corp. v. Newell Cos., Inc.,* 527 F.Supp. 733, 736 (D.Del.1981). That is why their choice of forum is *automatically* a "paramount consideration" which "should not be lightly disturbed." *See Shutte,* 431 F.2d at 25.

However, in the subsequent "balance of convenience" analysis, the Court puts aside the *fact* that the plaintiff selected a forum and, instead, explores whether the plaintiff "offer[s any] substantive *reasons* ... indicating that the convenience to it of litigating in [this forum] even approaches the inconvenience which trial in this forum will impose on the defendants and their witnesses." *Clopay,* 527 F.Supp. at 737 (emphasis added).

Of course, all other things being equal, the interests of a plaintiff with "rational and legitimate" reasons for filing in the District of Delaware will always weigh more heavily in the "balance of convenience" analysis than those of a plaintiff with no reason (other than, possibly, an improper one) for filing here. While this heavier weight does not

automatically prevent the "balance of convenience" from ultimately tipping strongly in favor of the defendant, it does predict that, as compared to the plaintiff with no (or an improper) reason for filing in Delaware, the one with rational and legitimate reasons enjoys a better chance of preventing the scales from so tipping and, thus, of defeating a motion to transfer.

In the two cases at bar, Affymetrix states that it had a rational and legitimate reason for filing in the District of Delaware—namely, to take advantage of the "lighter" and, therefore, "faster" docket. *Cf. C.R. Bard,* 997 F.Supp. at 562 (accepting this as a legitimate and rational reason); *Joint Stock,* 936 F.Supp. at 187 (same).

While this factor weighs against transfer, that is all that it does. As the Court has explained, the presence of rational and legitimate reasons which support the plaintiff's choice of forum neither obligate nor enable the Court to give anything more than "paramount consideration" to the plaintiff's choice of forum.

In the opinion of the Court, adopting the stance proposed by Affymetrix would alter the burden which a defendant bears on its motion to transfer since paying greater deference to the plaintiff's choice of forum would necessarily increase the burden which a defendant bears on its motion to transfer. The approach would lead to another double-counting by effectively considering a plaintiff's rational and legitimate reasons for selecting its forum twice—once, when establishing the burden that the defendant must overcome in order to prevail on its motion to transfer and then again, when weighing the relative "advantages and obstacles to a fair trial" presented by the two fora in the subsequent "balance of convenience" analysis.

Thus, in order to avoid confusion, the Court elects to address this factor later in its opinion—namely, in its discussion of some of the factors traditionally weighed in the "balance of convenience." *See* Section IV.B.2.b *infra* (discussing the "administrative difficulties posed by the relative congestion of the two dockets in the respective fora").

b. The Defendants' preferred forum.

Synteni and Incyte would prefer to litigate these matters in the Northern District of California. The Court, however, affords no weight to their mere preference to be elsewhere.

In the opinion of the Court, the preference for a forum carries no weight in the "balance of convenience" analysis. Instead, as with the plaintiff's choice of forum, the Court weighs the reason or reasons behind this preference in order to determine if they tip the "balance" strongly in favor of transfer.

From this perspective, the "defendants' preferred forum" collapses into other portions of the *Jumara* analysis. By considering the fact that a defendant prefers a different forum simply for its own sake, the Court believes that it would risk still another double-counting by effectively considering this factor twice—first, simply because the defendant prefers another forum and second, when weighing the reason or reasons behind this preference in the "balance of convenience" analysis.

Consequently, in its "balance of convenience" analysis, the Court elects to weigh only the reasons that Synteni and Incyte offer for preferring the Northern District of California. Again, in order to avoid the potential for confusion, the Court will discuss these reasons as they arise in its "balance of convenience" analysis. *See* Sections IV.

B.1.d—IV.B.1.f *infra; see also* Sections IV. B.2.a—IV.B.2.c *infra.*

c. Whether the claim arose elsewhere.

As with the previous two *Jumara* interests, the Court refrains from affording any weight to this factor in its "balance of convenience" analysis simply for its own sake.

If the "claim arose elsewhere," then it seems most likely the parties, the witnesses, the documents, and all of the other evidence will also be located "elsewhere." As a result, a defendant should have some strong arguments supporting its motion to transfer. In this light, all other things being equal, the "balance of convenience" should tip in favor of the forum which is located "elsewhere." However, this general observation may not always hold true in specific situations.

Thus, "whether the claim arose elsewhere" also collapses into other portions of the *Jumara* analysis. Consequently, the Court believes that considering the fact that the claim arose somewhere else for its own sake risks still another double-counting by effectively considering "whether the claim arose elsewhere" twice—first, simply because the "claim arose elsewhere" and second, because most of the parties, witnesses, and evidence are probably located there.

So, along with the plaintiff's choice of forum and the defendant's preference, the fact that the claim arose elsewhere should carry no weight in the "balance of convenience" analysis.[7] Instead, the Court examines

---

7. In the cases at bar, Synteni and Incyte claim the Northern District of California is the "center of gravity" of this dispute since all of the parties are headquartered there, almost all of the witnesses reside there, and all of the relevant documents and other evidence are located there.

In making this argument, Synteni and Incyte implicitly recognize that the Court should afford no weight to the claim (or, for that matter, even a finding) that the Northern District is the "center of gravity" of these disputes. Instead, Synteni and Incyte realize the need to show a connection between that district and this lawsuit since it is only those connections which the Court may properly weigh in its "balance of convenience."

As an aside, Affymetrix contends that the District of Delaware recently abandoned the "center of gravity" test in patent actions because of their national and, often, international character. *See Schering*, 969 F.Supp. at 269; *see also Bering*, 1998 WL 24354, at *2. Affymetrix, however, mis-

understands not only the *Schering* and *Bering* decisions but also the role that the "center of gravity" test plays in the transfer analysis.

First, in *Schering* and then again in *Bering*, Judge Schwartz recognized that the accused product allegedly developed from the patented technology was "sold internationally and generate[d] millions of dollars in revenues." *See Schering*, 969 F.Supp. at 269. For this reason, the dispute over the patent in suit could "hardly be described as a local ... controversy, or [as] implicating public policies unique" to one locale. *Id.* (citing *Jumara*, 55 F.3d at 879); *see also Bering*, 1998 WL 24354, at *4 (quoting *Schering*, 969 F.Supp. at 269). For these reasons, Judge Schwartz found that the "public interests ... did not tip the balance of convenience strongly in favor of" the defendant. *Id.*

In this portion of his analysis, Judge Schwartz did not weigh the factors considered in the "center of gravity" test (i.e., the location of the par-

whether the Northern District is a more convenient forum for the parties and the witnesses while also serving the interests of justice. *See* 28 U.S.C. § 1404(a).

d. The convenience of the parties as indicated by their relative physical and financial position.

Historically, the analysis under Section 1404(a) began here. *See, e.g., Shutte,* 431 F.2d at 23–24 (quoting the statute); *Burroughs,* 392 F.Supp. at 762 (same).

Physically, Delaware is equally inconvenient for all of the parties. As previously noted, Affymetrix, Synteni, and Incyte are all located in the area of northern California known as Silicon Valley. Thus, in order to litigate these matters before the Court, they must travel over six thousand miles round trip.

Financially, however, they are capable of shouldering this burden. They are all multimillion dollar corporations with interests and activities spanning the globe. *See Bering,* 1998 WL 24354, at *5 ("[B]oth parties are national corporations with revenues in the millions of dollars.... As such, the relative economic burden ... [of] litigating in Delaware is minimal.") (citing *Media Group,* 1996 WL 756760, at *5); *see also Sherwood,* 1996 WL 700261, at *3 (cited in *Media Group*). While their resources are not infinite, they are vast. Litigating in Delaware should not impose an undue financial burden on them.

Admittedly, if Synteni and Incyte were "local or regional business[es] that targeted a market in San Francisco or on the West Coast, [they] might be able to identify particular and unique problems that a smaller, local business would have in defending itself in a forum that is on the other side of the country." *See Wesley–Jessen Corp. v. Pilkington Visioncare, Inc.,* 157 F.R.D. 215, 218 (D.Del.1993). Synteni and Incyte, however, are "substantial corporation[s] that operate[ ] in the national [indeed international] marketplace and ... ha[ve] developed [their] business[es] in anticipation of doing business around the country [if not the world.]" *See id.* They must therefore show some sort of "unique or unexpected" burden in order to demonstrate that Delaware is an inconvenient forum. *See C.R. Bard,* 997 F.Supp. at 562 (citing *Wesley–Jessen,* 157 F.R.D. at 218); *Joint Stock,* 936 F.Supp. at 189 (citing same). This they have not done. Thus, the first portion of this factor fails to weigh in favor of transfer.

Nonetheless, by transferring these two cases to the Northern District of California, the Court would, to some extent, convenience all of the parties since they are all located in Silicon Valley. *Cf. Derry,* 555 F.Supp. at 1046 (refusing to transfer the case when so doing would merely shift the inconvenience from one party to another instead of reducing the overall level of convenience) (citing *De Luxe Game Corp. v. Wonder Prods. Co.,* 166 F.Supp. 56, 61 (S.D.N.Y.1958)). For example, even though litigation regardless of where it occurs will necessarily interfere with some of the day-to-day business operations of Affymetrix, Synteni, and Incyte, the Court recognizes that transferring these two cases

---

ties, witnesses, documents, or other evidence) because he had already taken them into account earlier in his opinion. *See Schering,* 969 F.Supp. at 268–69; *Bering,* 1998 WL 24354, at *5–7. Thus, the Judge neither explicitly nor implicitly rejected the center of gravity test.

Second, as the Court stated earlier in this footnote, the "center of gravity" test itself simply serves as a short-hand method for explaining that most of the parties, witnesses, documents, or other evidence are located in some other forum. *See Firmani v. Clarke,* 325 F.Supp. 689, 692 (D.Del.1971); *see also Pennwalt Corp. v. Purex Indus., Inc.,* 659 F.Supp. 287, 291 (D.Del.1986) (considering the location of the parties, witnesses, documents, and whether the acts or omissions giving rise to the lawsuit occurred in the target forum). As a result, this (other) forum is the "center of gravity" of the dispute. *See Sports Eye, Inc. v. Daily Racing Form, Inc.,* 565 F.Supp. 634, 637 (D.Del.1983) (transferring the case to the forum where the defendants and witnesses resided and the documents were located); *cf. Waste Distillation,* 775 F.Supp. at 766 (declining to find a "center of gravity" when the alleged illegal acts occurred in a number of different forums and the witnesses and documents were also located in different forums).

However, like some of the other factors which the Court has discussed in its opinion, the "grade" that a forum receives on the "center of gravity" test carries no weight in the "balance of convenience," especially when the presiding court has already considered the location of the parties, witnesses, documents, or other evidence in its analysis.

would minimize the level of disruption caused by trial or other legal proceedings since *all* of the parties are located in the Northern District. Thus, the second part of this factor weighs slightly in favor of transfer.[8]

### e. The convenience and availability of the witness.

Traditionally, the location of potential witnesses and, thus, their ability to be subject to compulsory process has weighed heavily in the "balance of convenience" analysis. *Cf.* 15 *Wright, Miller & Cooper* § 3581, at 415 (identifying this consideration as "[p]robably the most important factor, and the factor most frequently mentioned in passing on a motion to transfer"). There, however, are many different types of witnesses, and each one carries a different weight in the "balance of convenience" analysis.

██ Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed, obligated to procure the attendance of its own employees for trial. *See Sunds,* 1997 WL 74660, at 3. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies (especially in an action for patent infringement) because they "are usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any." *See Webster–Chicago,* 99 F.Supp. at 505; *see also Roller Bearing Co. of America v. Bearings, Inc.,* 260 F.Supp. 639, 640 (E.D.Pa.1966) (citing, *inter alia, Nocona Leather Goods Co. v. A.G. Spalding & Bros.,* 159 F.Supp. 269, 270–271 (D.Del.

1957)). Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See Jahncke Service, Inc. v. OKC Corp.,* 301 F.Supp. 866, 868 (D.Del.1969) (transferring the case because, *inter alia,* "nearly all the witnesses" were located in Louisiana, Texas, and Oklahoma).

### i. Dr. Fodor and Dr. Shalon.

Drs. Fodor and Shalon are the respective presidents of Affymetrix and Synteni. They are thus party witnesses and carry no weight in the "balance of convenience." *See Sunds,* 1997 WL 74660, at 3. The Court expects that their employers will ensure their attendance at trial regardless of where it is ultimately held. *See Bering,* 1998 WL 24354, at *5; *see also Sunds,* 1997 WL 74660, at *3.

### ii. Dr. Drmanac.

According to Synteni and Incyte, Dr. Drmanac (the president of Hyseq, another company being sued by Affymetrix for patent infringement) may possess knowledge about the prior art which might potentially invalidate the claims of the patents in suit. However, instead of simply identifying Dr. Drmanac as an expert in this area, Synteni and Incyte claim that he is a "percipient fact witness with critical personal knowledge relating to the conception and reduction to practice of [this] potentially invalidating prior art." Concerning his availability, in her affidavit, counsel for Synteni and Incyte avers that she has spoken with the attorney representing Dr. Drmanac. Based on this conversation, defense counsel represents that Dr.

---

8. Admittedly, Affymetrix would rather suffer some inconvenience than forgo a speedy trial. However, the "rational and legitimate" reason which Affymetrix advances for its choice of forum is only one factor weighed in the "balance of convenience." The Court places this factor on its scale just like it places the overall convenience that would be gained by all the parties if the Court transferred these cases to the Northern District of California on the scale. In short, even though Affymetrix does not want to take advantage of the proximity of the Northern District, Synteni and Incyte do. Thus, refusing to consid-

er this factor at all simply because one of the parties would rather discount it would appear to give Affymetrix a "trump card."

The Court declines to adopt this approach. Section 1404(a) and *Jumara* obligate the Court to *weigh* a variety of factors. Knocking these factors off the scale, therefore, seems improper, especially when at the behest of one of the parties. However, recognizing that the weight of some factors may ultimately off-set the weight of others is an altogether different approach, one which the Court considers entirely proper.

Drmanac is unwilling to appear for trial in the District of Delaware.[9]

The Court finds the portrayal of Dr. Drmanac as a fact witness unpersuasive and notes that Synteni and Incyte failed to raise it in their papers accompanying their second motion to transfer. The Court thus affords only the slightest weight to his reluctance to voluntarily appear for trial.

### iii. Professors Schena and Brown.

Synteni and Incyte claim that Professor Schena possesses critical personal knowledge concerning the development of the technology in the '934 patent as well as the prior art since, during the early 1990s, he worked in the laboratory of Professor Davis who, at the time, was performing subcontract work for Affymetrix. Thus, according to Synteni and Incyte, Professor Schena is not just an expert in this area but also a crucial fact witness. With respect to his availability, in her affidavit, defense counsel affirms that she has spoken with an attorney representing Professor Schena. Upon the basis of this conversation, she believes that Professor Schena is also unwilling to voluntarily attend trial.

In response, Affymetrix has filed with the Court an affidavit signed by Professor Schena stating that he has "never made any commitment to any party involved in this action as to [his] willingness to testify in Delaware."

The Court, however, is not exactly sure how to interpret the statement. At a minimum, the Court recognizes that, in his affidavit, Professor Schena fails to state that he would be willing to testify in Delaware. For this reason, the Court defers to the representations made by defense counsel that this forum appears to be inconvenient to Profes-

sor Schena and thus suggests that he might be unwilling to attend trial.

As far as Professor Brown is concerned, Synteni and Incyte also portray him as primarily a fact witness with additional expert knowledge about the prior art since he supervised Dr. Shalon's research at Stanford. In his affidavit, Professor Brown averred that attending trial would prove quite costly and disrupt both his teaching and research schedules. Thus, he is reluctant to voluntarily appear as a witness in this matter.

The Court believes that these Professors Schena and Brown are properly portrayed as both fact and expert witnesses. They were both at Stanford at the time that the patented technology was developed. Given their education and expertise, they have a tremendous amount of knowledge about the prior art. In addition, by their physical presence in the research laboratories and their associations with several of the scientists involved in these disputes, Professors Schena and Brown may also possess first-hand knowledge of relevant factual information. For these reasons, Professors Schena and Brown carry a heavy weight in the Court's "balance of convenience" analysis.

As residents of California, both of these witnesses are outside the Court's subpoena power. See Fed.R.Civ.P. 45(b)(2) (1996). Their interests thus weigh heavily in favor of transfer.

### iv. Professor Davis and the remaining inventors named on the '934, '305, and '992 patents.

In its papers, Affymetrix represents that Professor Davis would be willing to appear at trial if his testimony is needed.[10] Four of the five remaining inventors listed on the patents in suit have also pledged that they will make themselves available for trial,[11] especially if

---

9. As an aside, while the Court would have preferred to hear these sentiments directly from the witness himself by way of affidavit, it nonetheless takes counsel at her word. See Fed.R.Civ.P. 11(b).

10. As with Dr. Drmanac, the Court would have preferred to hear these words directly from Professor Davis by way of affidavit, it nonetheless takes Affymetrix at its word. See Fed.R.Civ.P. 11(b).

11. The Court lacks any such assurances from Professor Pirrung (probably because he either lives or resides outside the subpoena power of both the District of Delaware and the Northern District of California). For this reason, the Court gives no weight to his interests in the balance of convenience analysis.

given sufficient advanced notice. However, the mere assurance that these individuals will "appear at trial is not the same thing as having them amenable to the subpoena power of the trial court." *See Sherwood*, 1996 WL 700261, at *5; *see also Pennwalt* 659 F.Supp. at 291 ("It is desirable to hold trial at a place where the personal attendance of witnesses through the use of subpoena power can be reasonably assured). For "even previously cooperative witnesses may become reluctant participants where a trial in a distant state such as Delaware promises the incurrence of substantial, prolonged inconvenience." *See Alcon Lab., Inc. v. Starr Surgical Co.*, Civ. A. No. 95–233, Magis Report & Rec. at 18 (D.Del. Oct. 26, 1995).

Thus, the interests of these witness not only fail to weigh against transfer but actually weigh strongly in favor of transfer.

> v. The numerous unnamed individuals possibly residing in Silicon Valley who might possess information relevant to these two lawsuits.

Finally, with respect to the numerous "unnamed" individuals possibly residing in Silicon Valley who might possess some knowledge about either the prior art or the underlying facts giving rise to this lawsuit, the Court affords them no weight in its "balance of convenience" analysis. Given the complete lack of specificity with which these witnesses were identified and the absence of "adequate information with respect to the content and materiality" of their testimony, the Court has no other choice but to discount them in its weighing test. *See United Air Lines v. United States*, 192 F.Supp. 795, 796 (D.Del.1959); *see also Sunds*, 1997 WL 74660, at *3 (failing to specify the identity and testimony of potential witnesses fails to tip the balance of convenience in favor of transfer).

> f. The location of records and other documents.

The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analy-

sis, *see Tuff Torq.*, 882 F.Supp. at 363, by "substantially reduc[ing] the burden of … litigat[ing] in a distant forum." *See Wesley–Jessen*, 157 F.R.D. at 218. Thus, while all of the relevant documents (including numerous laboratory notebooks) are apparently located in the Northern District of California, this factor weighs only minimally in favor of transfer. *Cf. Critikon v. Becton Dickinson Vascular Access, Inc.*, 821 F.Supp. 962, 966–67 (D.Del.1993) ("[T]he location of documents, in the context of access to proof, in a document-intensive case [like an action for patent infringement] can be misleading. … Regardless of where trial is held, the documents will be copied and mailed to the offices of counsel and subsequently transported to trial.").

### 2. The public interests.

As other courts have noted, depending upon the circumstances of the case, some of the "public interests" listed in *Jumara* may play no role in the "balance of convenience." *See Sunds*, 1997 WL 74660, at *4. The Court elects to discuss only those four which are relevant to the two cases pending before it.

> a. Practical considerations, making trial easy, expeditious, or inexpensive.

Historically subsumed within the "interests of justice" portion of the transfer analysis,[12] this factor appears to substantially repeat the "rational and legitimate reason" advanced by Affymetrix for choosing this forum in the first place (i.e., the "lighter" and "faster" docket) as well as the technological advances which have reduced the cost of litigating in distant fora. Accordingly, the Court will *not* discuss these considerations here since, in so doing, it would double-count these factors, throwing off the "balance of convenience."

Nonetheless, the Court does note that by filing in Delaware, Affymetrix forced all parties to retain local counsel. *See* D. Del. R. L.R. 83.5(b) (1995); *see also Media Group*, 1996 WL 756760, at *7 (taking this factor into consideration). If the Court transferred

---

**12.** As originally articulated by the *Gulf Oil* court, this factor was a "private interest" belonging to

the litigant. *See Gulf Oil*, 330 U.S. at 508, 67 S.Ct. at 843.

these actions to the Northern District of California, it would eliminate this expense for not only Synteni and Incyte but also Affymetrix.

Thus, this factor weighs, if only slightly, in favor of transfer. *See Derry*, 555 F.Supp. at 1046 (recognizing that merely shifting inconvenience between the parties, instead of reducing the overall level of inconvenience among all the parties, typically fails to tilt the "balance of convenience" strongly in favor of transfer). While transferring these two cases would reduce the costs of litigation for all parties by eliminating the need for local counsel, as already noted, these three corporations are capable of bearing the financial burden of litigating here.[13]

b. The administrative difficulties posed by the relative congestion of the two dockets in the respective fora.

The Court now elects to discuss the one, lone "rational and legitimate" reason advanced by Affymetrix supporting its choice of forum.

Affymetrix states that it filed these two lawsuits in the District of Delaware because of its "lighter" and, therefore, "faster" docket. And, as previously discussed, this is a rational and legitimate concern. *See Joint Stock*, 936 F.Supp. at 190; *see also Tuff Torq*, 882 F.Supp. at 364 (taking into account the "speed" at which the litigation could proceed in the respective fora); *Media Group*, 1996 WL 756760, at *7 (same).

In support of this contention, Affymetrix cites a variety of statistics from the Administrative Office of the United States Courts. *Cf. Solomon v. Continental American Life Ins. Co.*, 472 F.2d 1043, 1047 (3d Cir.1973) (allowing the use of this data to determine if transfer would serve the interests of justice). Synteni and Incyte counter with statistics of their own, also from the Administrative Office.

Specifically, Affymetrix points out that, in 1997, there were 6,524 cases filed in the Northern District of California as opposed to 570 in the District of Delaware. Furthermore, that same year, the Northern District had 5,792 cases pending where the District of Delaware had a "mere" 870.

Synteni and Incyte, however, respond by noting that the average time to trial for civil cases in both districts is virtually the same. Apparently, in 1997, the median time between filing and trial in the Northern District is 20 months as opposed to 18 in the District of Delaware.

Therefore, while the "lighter" and, therefore, "faster" docket weighs against transfer, it does so only slightly.

Synteni and Incyte also point out that Affymetrix has filed a similar action for patent infringement against Hyseq, another microarray company, in the Northern District of California. Accordingly, they argue that the Court should grant their motions to transfer in the interests of judicial economy.

In *Tracy v. Consolidated Rail Corp.*, Judge Latchum noted that the "interest of justice favors transferring a case to a jurisdiction where related matters are pending." 723 F.Supp. 1051, 1052 (D.Del.1989). *Tracy*, of course, involved a collision between a passenger train and a tractor trailer driven by the plaintiff, Mr. Tracy. *Id.* at 1051.

Judge Latchum transferred the action because Mr. Tracy was not just a plaintiff in his action but also a defendant or a third-party in three other actions that were pending before the Eastern District of Pennsylvania. *Id.* at 1052. Moreover, all three of these cases were pending before the same District Judge. *Id.* Finally, all four of these actions involved the same questions of law and fact.

The lawsuits against Hyseq, Synteni, and Incyte present a slightly different situation. For example, although the lawsuit against Hyseq also concerns the '305 and '992 patents, it also includes allegations about

---

**13.** For the record, despite its appearance, the Court is *not* double-counting the fact that Affymetrix, Synteni, and Incyte are all multi-million dollar corporations. Instead, the Court is merely recognizing that, under these particular circumstances, the relative financial position of the parties carries great weight in the "balance of convenience" analysis which might off-set the lighter weight of other factors. *Cf.* Note 8 *supra* (recognizing that certain factors may ultimately cancel each other out when placed on the "balance of convenience").

the '716 patent—one that is not in suit in these proceedings. In addition, the actions currently pending before this Court contain allegations concerning the '934 patent, which is not in suit in the action filed against Hyseq. So, while these three lawsuits involve *some* of the same patents, they do not involve *all* of the same patents.

Furthermore, while all three of these actions involve the *same* patented technology, they (by definition) concern entirely *different* accused products. The action filed against Synteni and Incyte involves the GEM array. While the lawsuit filed against Hyseq also concerns another high-density probe array (sold under the trademark "HyChip"), that dispute appears to center around the use of patented computer technology used to perform different types of genetic analysis.

Thus, the Court affords little weight to the arguments which Synteni and Incyte make concerning the potential problems raised by dual *Markman* hearings. Neither Synteni nor Incyte have offered anything, other than mere conjecture, to show that the issues in these two sets of cases are so similar that either the asserted claims or the disputed claim terms would be the same in both instances.

Nevertheless, the Court recognizes that, given the pending action against Hyseq in which Affymetrix is a party, transferring these two cases to the Northern District of California might achieve a certain degree of judicial economy. For this reason, this factor weighs slightly in favor of transfer.

c. The local interest in deciding local controversies at home.

Synteni and Incyte claim that, compared to the District of Delaware, the Northern District of California has a far stronger interest in resolving these actions since all of the companies are located there and, as a consequence, all of the technology described in the patents in suit was developed there.

However, as previously discussed, the Court can hardly describe the dispute over the '994, '305, and '992 patents as a local controversy unique to the Northern District. Affymetrix, Synteni, and Incyte all conduct business on an international level. The technologies which they have developed are used by numerous medical, pharmaceutical, and scientific laboratories scattered across the globe.

Thus, the Court affords *no* weight to this factor in the "balance of convenience" analysis. *Cf. Schering,* 969 F.Supp. at 269.

Synteni and Incyte also note that, in their Answer to the September 1, 1998 Complaint, they raise a number of counterclaims based on state (i.e., California) law. Specifically, they allege unfair competition, tortious interference with prospective economic advantage, slander of title, and trade libel by Affymetrix.

With respect to the claim for unfair competition, the Court notes that it arises under the Lanham Act, a federal statute, which "is not unique to Delaware and can be resolved by any federal district court." *See Media Group,* 1996 WL 756760, at *8. Therefore, the Court affords this factor no weight in its "balance of convenience" analysis.

As far as the state law claims are concerned, the Court also affords them no weight either. First, for the reasons expressed by the Supreme Court in *Hoffman,* the Court fails to see how the conduct of a defendant after the filing of a lawsuit could legitimately lead to a favorable ruling on transfer. *See Hoffman,* 363 U.S. at 343, 80 S.Ct. at 1089 (quoting *Paramount,* 186 F.2d at 119). Second, if Synteni and Incyte are concerned that the Court may misinterpret or misapply the Laws of the State of California, then they could voluntarily sever their state claims and file them in the appropriate California court. *Cf. Minstar, Inc. v. Laborde,* 626 F.Supp. 142, 147 (D.Del.1985). While an arguably inefficient use of judicial resources, the approach would prevent Synteni and Incyte (and, thus, discourages future litigants) from attaching state law claims over which the Court exercises discretionary jurisdiction in order to defeat a motion to transfer. *Cf. id.*

d. The public policies of the fora.

In its papers, Affymetrix goes to great lengths to show that Synteni and Incyte

maintain several connections to the District of Delaware.

In the cases at bar, however, the Court conducts a *transfer* and not a *minimum contacts* or *purposeful availment* analysis. *Compare* 28 U.S.C. § 1404(a) *with International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

The Court may properly exercise personal jurisdiction over Synteni and Incyte because they are Delaware corporations and, therefore, Delaware residents. *See* 28 U.S.C. § 1391(c) (1994). Therefore, the Court need *not* inquire into whether they have "minimum contacts" with or have "purposely availed" themselves of the jurisdiction. In other words, when ruling on their motions to transfer, the Court asks whether this particular forum is the most convenient place in which to try these two lawsuits, not whether the maintenance of these suits "offend[s] 'traditional notions of fair play and substantial justice.' " *See International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).

While Synteni and Incyte have arguably reached out to this jurisdiction to pursue business relationships with Zeneca, DuPont, and DuPont Merck, the Court fails to see how this activity bears on the question of whether trying these two cases in the District Delaware would convenience the parties or the witnesses while serving the interests of justice. *See* 28 U.S.C. § 1404(a). In short, none of these three pharmaceutical companies are either parties to or witnesses in the cases at bar. Thus, although Synteni and Incyte have in the past availed themselves to the jurisdiction, their business dealings with Zeneca, DuPont, and DuPont Merck at present have no bearing on the lawsuit filed by Affymetrix. For this reason, the Court affords this factor *no* weight in its "balance of convenience" analysis.

## V. CONCLUSION.

■ By definition, a transfer analysis is a thoughtful weighing of interests. And, as an exercise of discretion, this process is, at least to some extent, subjective.

Thus, while the Court can look to precedent for guidance, it reminds the parties that the weight which one court might afford to one factor on one day might very well differ from the weight afforded to that same factor by a different court, located in a different district, presiding over a different litigation, between different parties, concerning a different cause of action, involving different facts, different witnesses, and different documents on a different day.

On this day, in the opinion of this Court, the following factors weigh against transfer. First, all of the parties are multi-million dollar corporations that can afford to litigate in a distant forum. *See* Section IV.B.1.d *supra*. Second, the "lighter" and "faster" docket here insures that Affymetrix will receive a relatively speedy trial. *See* Section IV.B.2.b *supra*.

In addition, a few factors failed to weigh either for or against transfer today. For example, while many (if not all) of the documents are located elsewhere, recent technological advances have reduced the weight of this factor to virtually nothing. *See* Section IV.B.1.f *supra*. Furthermore, as actions for patent infringement, these two lawsuits have national, indeed, international implications. Thus, the Court can find no true local interest or controversy weighing in favor of transfer. *See* Section IV.B.2.c *supra*. Finally, the business relationships between Synteni and Incyte and Zeneca, DuPont, and DuPont Merck carry no weight in the Court's "balance of convenience" analysis since none of these three pharmaceutical companies are, in any way, connected to the cases at bar. *See* Section IV.B.2.d *supra*.

But, most important, a number of significant factors weighed in favor of transfer. First, all of the witnesses are located outside of the Court's subpoena power. *See* Section IV.B.1.e *supra*. Thus, despite some of their assurances, the Court cannot guarantee that they will appear for trial. Second, despite their financial ability to litigate in the District of Delaware, transferring these two cases would reduce the costs to *all* parties involved in this litigation. *See* Section IV.

B.1.d *supra.* Third, the Court believes that transferring the two actions to the Northern District of California where another suit filed by Affymetrix is pending may achieve a certain degree of judicial economy. *See* Section IV.B.2.b *supra.* Fourth, and finally, transfer would also eliminate the need for local counsel, further reducing the cost of the litigation for *all* parties. *See* Section IV.B.2.a *supra.*

For these reasons, the Court believes that the "balance of convenience" tips enough in favor of Synteni and Incyte to grant their motions to transfer. The appropriate orders shall issue.